IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

DARREN SMITH                                                          PLAINTIFF

v.                              No. 4:13CV00301 JLH

ARKANSAS HIGHWAY POLICE;
RON BURKS, individually and as Chief
of the Arkansas Highway Police;
PAUL CLAUNCH, Major;
JEFF HOLMES, Captain; and
JAMES "BOOBIE" MOORE, Lieutenant                                     DEFENDANTS

## OPINION AND ORDER

Darren Smith brings this employment-discrimination action against the Arkansas Highway Police, Chief Ron Burks, Major Paul Claunch, Captain Jeff Holmes, and Lieutenant James Moore. Smith alleges that he was the victim of racial discrimination and retaliation by the Arkansas Highway Police, in violation of Title VII of the Civil Rights Act of 1964,[1] and by the individual defendants in their official and individual capacities, in violation of 42 U.S.C. §§ 1981 and 1983. The defendants have filed a motion for summary judgment, a motion to strike three affidavits submitted by Smith, and three motions in limine. Smith has also filed a motion in limine. For the reasons explained below, the motion for summary judgment is granted in part and denied in part; the motion to strike is denied; Smith's motion in limine and the defendants' first, second, and third motions in limine are granted in part and denied in part.

## I.

The Arkansas Highway Police is a division of the Arkansas Highway & Transportation

---

[1] 42 U.S.C. § 2000e, *et seq.*

Department.[2]   The Arkansas Highway Police hired Smith in May 2001 and discharged him, allegedly for dishonesty, in July 2012.  In the intervening eleven years, numerous complaints were lodged by and against Smith.  Some but not all of that history will be recounted here.

In May 2002, Smith's direct supervisor was a Caucasian, James Moore.[3]  Moore used a racial slur in the presence of Smith, who is African-American, and two Caucasian officers.  *See* Pl. Ex. 2 at 3.  No immediate disciplinary action was taken.  *Id.*  Some time later, disciplinary proceedings were initiated against Sergeant Harold Huey, also a Caucasian, who had made a racial comment regarding four African-American Arkansas Highway Police officers.  *Id.* at 4.  Huey objected to the discipline, arguing that Moore had not been disciplined for his use of a racial slur.  *Id.*  Huey and Moore were both subsequently disciplined.  *See, e.g.*, Def. Ex. 18.

In August 2002, Smith contacted human resources officer Crystal Cole, alleging various incidents of race discrimination.  *See* Def. Ex. 29.  Cole's report found no evidence to support Smith's allegations of race discrimination, but it did recommend a district-wide meeting with the chief of the human resources office to discuss, among several other items, "[r]acist remarks (black faces, crackers, etc...)."  *Id.* at 6.

In 2004, Captain Joe Black, an African-American, sat on a panel with Burks to interview a number of officers for a several promotions to the rank of corporal.  Pl. Ex. 2 at 3.  A number of African-American officers scored very well on the promotion exam.  In Black's presence, Burks

---

[2] The Arkansas Highway Police should not be confused with the Arkansas State Police, which is an entirely separate agency.

[3] The Arkansas Highway Police's officer ranking system is organized by descending order into the following ranks: Chief, Major, Captain, First Lieutenant, Second Lieutenant, Investigator, Motor Carrier Safety Inspector, Sergeant, Corporal, Patrol Officer First Class, and Patrol Officer. Burks Aff. ¶ 3, Def. Ex. 55.

expressed disbelief that the African-American candidates, as a group, were capable of performing to that level, and he stated that cheating must have been involved. *Id.*

Smith filed a grievance in 2004, claiming various incidents of racial discrimination involving then-First Lieutenants Moore and Holmes, among others. Def. Ex. 19. Furthermore, Smith filed a federal lawsuit alleging claims of racial discrimination and retaliation against the Arkansas Highway Police, Director Dan Flowers, and Burks. *Smith v. Flowers, et al.*, No. 4:04CV1256 SWW (E.D. Ark. October 26, 2004). Smith and the defendants in that action reached a settlement agreement under which the defendants acknowledged no wrongdoing but Smith received, among other things, a promotion to the rank of corporal in return for releasing his legal claims. Def. Ex. 21.

In July 2007, Smith made a telephone call to Cole and stated that he did not want to file a complaint but that he wanted to make her aware that Burks was subjecting him to disparate treatment and that the issues might be coming to a head. Def. Ex. 32. Smith informed Cole that Black and First Lieutenant James Speer could inform her about Burks's actions and attitudes toward him. *Id.* The report stated that both Black and Speer believed that Burks subjected Smith to much closer scrutiny than other officers in various ways. *Id.* A subsequent human resources grievance report recommended that "Burks should be advised that Black, Speer, and Smith believe Burks is more focused on Smith and his activities than other officers, although no evidence has been found to indicate that this perception is accurate." *Id.*

In May 2009, Smith filed a grievance alleging that he did not receive a promotion to either of two sergeant positions due to racial discrimination. Def. Ex. 25. One Caucasian and one African-American officer were promoted instead of Smith. The grievance stated that Smith's objective points put him ahead of one of the two officers who received the promotion. *Id.* Smith challenged

the subjective portion of the evaluation process, arguing that the interview panel included persons who could not fairly evaluate him.  The panel included Cole, Burks, and Claunch, who was Burks's subordinate.  *Id*.  Burks offered to meet with Smith to discuss the process, but Smith declined.  *See* Def. Ex. 26.  A grievance panel reviewed Smith's grievance and found that Smith's claim of racial discrimination was not supported by the evidence.  *See* Def. Ex. 38 & 39.

In January 2011, a man named Coyelle Williams called the Arkansas Highway Police to complain that Smith had been in a bedroom with a woman named Keisha Poney in Hughes, Arkansas.  Def. Ex. 42.  Smith strongly denied the allegations.  *Id*.  Speer investigated the complaint by questioning Smith and several other individuals about a possible relationship between Smith and Poney.  *Id*.  Smith filed a grievance regarding the Arkansas Highway Police's investigation procedures, alleging further racial discrimination and disparate treatment against African-American officers.  *See* Def. Ex. 40 & 41.  The grievance panel found that every citizen complaint, including the one against Smith, should be investigated, but it also recommended that the Arkansas Highway Police develop procedures regarding how verbal and written complaints were to be handled in the future.  Def. Ex. 43 & 45.  When the Arkansas Highway Police concluded its internal investigation, Burks sent a letter to Woods stating that an inquiry had determined that there was insufficient information to prove or disprove the allegations against Smith.  Pl. Ex. 6.

In June 2011, Smith filed other grievances, alleging that Moore discriminated against him by not recommending him for a merit raise.  Def. Ex. 44.  Moore had recommended two of Smith's subordinates for raises.  *Id*.  Smith alleged that race discrimination and the ongoing internal investigation against him played a role in Moore's decision not to recommend Smith for a merit raise.  *Id*.  Smith also alleged that Burks and Holmes were undermining his supervisory authority by overturning his decision to discipline a subordinate and by inviting one of his subordinates to

4

attend a public meeting without even informing Smith that the meeting was taking place. *See* Def. Ex. 48.  The Arkansas Highway & Transportation Department Equal Employment Opportunity section conducted an investigation regarding Smith's allegations.  *Id.*  The section determined that Holmes should have informed Smith of the public meeting, but otherwise the section's report found no evidence of discrimination or retaliation against Smith.  *Id.*  The report stated that Smith was not recommended for a merit raise because of the appearance of his uniform, his failure to maintain his vehicle, and his failing to turn in his paperwork to the courts on time.  *Id.*

On November 8, 2011, Smith received via email a letter advising that he would be promoted from sergeant to the rank of motor carrier safety inspector effective November 17, 2011 and reassigned to northwest Arkansas.  Def. Ex. 69.  The letter stated that Smith should contact Claunch for information regarding Smith's specific reporting date to northwest Arkansas.  Def. Ex. 69.  At that time Smith lived in Jonesboro, a city in the northeastern part of the state.  The promotion letter informed Smith that he was required to establish a permanent domicile in northwestern Arkansas within 90 days of his reporting time.  *Id.*  The letter also stated that moving expenses would be reimbursed only with prior approval from the director.  *Id.*  Smith was under the impression that he would not have to report to northwest Arkansas until his court calendar in northeast Arkansas had cleared.  Def. Ex. 71, 72.  Smith attempted to contact Claunch, but he was on leave and unavailable. On November 15, 2011, Smith's immediate supervisor, Lieutenant Ross Batson, met with Smith and advised that his reporting date to northwest Arkansas would be November 18.  Def. Ex. 71.  Batson told Smith that the Arkansas Highway Police would reimburse him for a hotel stay of up to two weeks while he sought a temporary residence in northwest Arkansas.  *Id.*

Shortly after his meeting with Batson, Smith decided to take a week of annual leave to facilitate his move.  *Id.*  Batson approved the leave.  *Id.*  Smith enlisted three of his brothers to help

5

him move his family to northwest Arkansas, and he agreed to pay them $300.00 each.  At that time Smith was aware that a fellow Arkansas Highway Police officer, Territha Reed, had requested and received reimbursement for a sum that included an amount paid to three moving helpers, some of whom were her family members.

Smith was identified to the Arkansas Highway Police and Burks as a witness for Ricky Smith, the plaintiff in an employment-discrimination lawsuit against them.  On November 10, 2011, Smith provided deposition testimony favorable to Ricky Smith.  Smith, the plaintiff here, testified that Burks had engaged in racially-discriminatory actions against minorities. Def. Br. In Support of S.J. at 50.

On January 19, 2012, Smith sought reimbursement for travel expenses in the amount of $900.00.  Def. Ex. 70.  Smith listed his three brothers as moving helpers on his reimbursement request.  *Id*.  Smith's request for reimbursement was denied because he had not received preapproval, and on February 9, 2012, he filed a grievance, claiming that he had insufficient time to obtain preapproval.  Def. Ex. 71.

After Smith's request was denied, Claunch called Reed in to sign a notarized affidavit regarding the amounts she had paid to her moving helpers.  Def. Ex. 76; *see* Def. Ex. 83 at 21. Smith pursued his grievance to a hearing before a grievance panel.  Pam Hickman, Assistant Division Head of Human Resources, was the facilitator of the grievance hearing.  Def. Ex. 130. After hearing Smith's testimony, Hickman approached Burks and related her impression that Smith had stated during the grievance hearing that the Arkansas Highway Police made him move to northwest Arkansas and then immediately sent him back to train with a federal trainer in northeast Arkansas.  *Id*. at ¶ 3.  Hickman provided Burks with a copy of the grievance hearing testimony, and Burks began an investigation of Smith's testimony.

Meanwhile, on March 13, 2012, the court hearing Ricky Smith's employment-discrimination case granted summary judgment in favor of the Arkansas Highway Police and Burks. *Smith v. Arkansas Highway Police*, No. 4:10-CV-01557-SWW, 2012 WL 846441, at *9 (E.D. Ark. Mar. 13, 2012).

Smith's reimbursement grievance hearing was held on May 14, 2012. *See* Def. Ex. 72. On May 15, 2012, the grievance panel issued a memorandum to Scott Bennett, Director of the Arkansas Highway & Transportation Department, in which it recommended that Smith not be reimbursed. Def. Ex. 74. The memorandum stated that Smith failed to obtain prior approval of the expenses in accordance with Arkansas Highway Police policy. It also stated that there was no need for Smith to move within 48 hours as he had claimed and that Smith had adequate time to find temporary or permanent residence. *Id.* Furthermore, the memorandum stated that the panel members believed that the chances of fraud or abuse are too great to approve the paying of family members as a moving expense. *Id.*

In a letter dated June 19, 2012, Burks informed Smith that disciplinary action was being considered for what the letter described as his allegedly misleading and false statements during the grievance hearing. Def. Ex. 73. The letter stated that Smith had dishonestly stated that for over six months he has been working with Tony Evans, a Federal Motor Carrier Safety Administrator who lived in northeastern Arkansas; that he had not once conducted a motor carrier compliance review in northwest Arkansas in the preceding six months; that Batson had notarized an affidavit of a coworker, Territha Reed, and that she was reimbursed for $1,600 or $1,700 in moving expenses; that Batson had approved and signed his reimbursement request and that the request had been approved at a supervisory level; and that he only had 48 hours to move and did not have time to find suitable housing because he was working every day until five or six o'clock p.m. *Id.*

On June 21, 2012, Smith filed a grievance and a charge of discrimination with the Equal Employment Opportunity Commission, alleging discrimination on the basis of race and retaliation for a previously-filed charge of discrimination and other complaints, in violation of Title VII.  Def. Ex. 86.  Smith stated that over the course of the previous year he had been subjected to unequal terms and conditions of employment and that he was also being improperly subjected to a disciplinary hearing.  *Id.*

On June 29, 2012, Burks and Claunch conducted an administrative hearing regarding Smith's statements.  *See* Def. Ex. 78.  Smith took the opportunity to explain his statements to them.  *Id.*  In a memorandum to Burks dated July 2, 2012, Claunch stated that based on the grievance hearing testimony, Burks's letter to Smith, and Smith's testimony during the administrative hearing, he recommended that Smith's employment be terminated.  Def. Ex. 79.  In a memorandum dated July 3, 2012, Burks also recommended Smith's termination based on the same statements that were detailed in his June 19 letter.  *See* Def. Ex. 80; Def. Ex. 73.  The memorandum stated that it had been alleged that these statements were in violation of the Arkansas Highway & Transportation Department's Conduct of Employees policy, section E.19; the Arkansas Highway Police's General Instructions policy; and the Arkansas Highway Police's Code of Ethics[4]—policies concerning honesty and truthfulness.  Burks's memorandum stated that "[a]t the conclusion of the administrative hearing it was determined Smith failed to provide any reasonable justification for his untruthful statements and

---

[4]  The Conduct of Employees policy, section E.19, states: "Conduct deemed inappropriate for the workplace, including, but not limited to, the following is considered grounds for dismissal . . . : * * * 19. Dishonesty."  Def. Ex. 10.  The General Instructions, section III.01.B—(1d), states: "The following shall be observed by all Arkansas Highway Police Officers. * * * He shall not depart from the truth in any matter pertaining to the official performance of duty or in reporting to a superior."  Def. Ex. 90.  The Code of Ethics states, in pertinent part: "Honesty in thought and deed in both my personal and official life is my aim."  Def. Ex. 89.

he was found to be in violation of the aforementioned policies." Def. Ex. 80.  On July 9, Bennett approved Smith's termination after reviewing parts of the hearing transcript.  In a letter to Smith dated July 9, 2012, Burks outlined the allegations against him and informed him that his employment was terminated effective immediately.  Def. Ex. 1.

On August 6, 2012, Smith filed a grievance regarding his termination.  Def. Ex. 82.  In a memorandum Smith requested a thorough review of the full transcript of the reimbursement grievance hearing, stating that his statements were accurate when not stripped of their context.  *Id*. A termination grievance hearing was held, in which Smith presented his case that he was truthful during the reimbursement grievance hearing and that his termination was wrongful.  *See* Def. Ex. 83.  On October 2, 2012, the termination grievance panel recommended that the decision to terminate Smith should stand, finding that the documentation showed that Smith had given false and misleading information to the reimbursement grievance panel and that his termination was justified. Def. Ex. 84.  In a letter dated October 3, 2012, Bennett informed Smith of the panel's decision and stated that no further action would be taken concerning his grievance.  Def. Ex. 85.

On August 17, 2012, Smith amended his previous EEOC charge to include a claims of disparate treatment, racially-motivated employment decision, and retaliation for his involvement in protected activity and for opposing discriminatory practices.  Def. Ex. 86.

On February 12, 2013, Smith filed another charge of discrimination.  *Id*.  Smith's complaint alleged that in January 2013 he had submitted two applications for employment with the Arkansas Department of Corrections.  After interviewing, receiving an offer of employment, and completing the initial requirements for a Lieutenant position at Brickeys, Arkansas, Smith was informed that he would not be hired due to a negative reference from the Arkansas Highway Police.  *Id*.  Smith then received notice that he would be scheduled for an interview for a Captain position at Newport,

9

Arkansas. But subsequently Smith was told not to come for that interview because the same officials who had withdrawn his offer of employment for the Lieutenant position would be making the decision regarding his eligibility for the Captain position. *Id.* The EEOC issued Smith right-to-sue letters. Document #1 at 28-29. On May 20, 2013, Smith brought this action.

## II.

Smith asserts Title VII discrimination and retaliation claims against the Arkansas Highway Police and section 1981 claims against Burks, Claunch, Holmes, and Moore in both their individual and official capacities.

### A.    Title VII Claims against the Arkansas Highway Police

#### 1.    *Title VII Discrimination Claim*

Absent direct evidence of discrimination, this Court analyzes Title VII discrimination claims under the *McDonnell Douglas* burden-shifting framework. *Norman v. Union Pac. R.R. Co.*, 606 F.3d 455, 459 (8th Cir. 2010) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)). Under that framework, Smith must first establish a prima facie case of discrimination by showing that 1) he is a member of a protected class; 2) he met the Arkansas Highway Police's legitimate expectations; 3) he suffered an adverse employment action; and 4) the circumstances give rise to an inference of discrimination. *See Muor v. U.S. Bank Nat. Ass'n*, 716 F.3d 1072, 1076 (8th Cir. 2013). If Smith establishes a prima facie case, then the burden shifts to the Arkansas Highway Police to articulate a nondiscriminatory reason for the adverse action. *See Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 792 (8th Cir. 2011). And if the Arkansas Highway Police meet this burden, Smith must show that the Arkansas Highway Police's proffered reason is merely a pretext for discrimination. *See id.*

The parties do not dispute the first element, that Smith is a member of a protected class.

Regarding the second element, the defendants discuss four disciplinary issues involving Smith from 2002 to 2011, but the defendants do not seriously contend that Smith failed to meet the Arkansas Highway Police's legitimate expectations before his reimbursement grievance hearing on May 14, 2012.  Burks's letter to Smith stated that the grounds for his termination consisted of allegedly false or misleading statements that Smith made during that hearing.  Def. Ex. 1; *see* Def.'s Br. in Supp. at 18-19; Def.'s St. Facts at 16 ¶ 89.  Smith's statements are quoted below as they appear in the grievance hearing transcript.

The first statement is:

Because for the last 6 months, I've been assigned to a Federal Motor Carrier Safety Trainer.  Okay?  You know where that trainer is from?  One of those trainers is from?  Paragould, Arkansas.  So I've been working with somebody from Paragould, which is 36 miles away from where I lived, for over 6 months.

Def. Ex. 72 at 6.  Similarly, Smith stated that immediately after he was reassigned to northwest Arkansas, the Arkansas Highway Police "sen[t] [him] back to work with the man that lived 36 miles away from me."  Ex. 72 at 12.  The defendants argue that Smith's claim is the "false statement that he was sent '*back*' to Northeast Arkansas to work" for over six months with a federal trainer.  Def.'s St. Facts at 21 ¶ 120 (citing Ex. 72 at 6); *see id.* ¶ 121.  They contend that Smith had only worked with the federal trainer from Paragould, Tony Evans, for a period of four days and that this work was conducted in Van Buren, Arkansas—not in northeast Arkansas.  Smith responds that he worked with Evans for more than four days in Van Buren and Little Rock, but that it was not his intent to say that he was working with Evans for the entire six months of his training.  He notes his statement that Evans was "one of those trainers," indicating that Evans was not the only trainer he worked with.  Def. Ex. 72 at 6.  Moreover, Smith argues that he never claimed to be sent back to work in northeastern Arkansas.  He contends that his statement that he was sent "back to work with the man

that lived 36 miles away from" where he used to live is not a claim that he was sent back to northeastern Arkansas but that he was assigned to a trainer who, ironically, lived close to his former residence in northeastern Arkansas.

The second statement is:

> I've been in training since November 18th. And I'm still in training today. And guess what? I've been to Little Rock. I've been to Russellville. I have not done one case—listen to me—not one case in northwest Arkansas have I done a compliance review. Not one. I have not done a compliance review on a motor carrier in northwest Arkansas. Russellville and back is where my case has been. But I live in Van Buren.

Def. Ex. 72 at 9. The defendants argue that Smith had done at least ten compliance reviews in northwest Arkansas and that these are confirmed by his time sheets, which include notations of "CR" for "compliance review" on various dates. *See* Def. Ex. 75. Smith responds that while he had participated in compliance reviews, he was not legally qualified to conduct the reviews because he was still in training. He argues that his assigned federal field training agents conducted the reviews and were responsible for them. He argues that his supervisor instructed him to note on his time sheet the time he spent training so that the Arkansas Highway Police could bill the Federal Motor Carrier Safety Administrator for his time.

The third statement is:

> But on Teritha, do you know that they had her fill out an Affidavit. Ross [Batson] said he didn't know nothing about it but guess who notarized the Affidavit? Lt. Batson. Now, how do you say you don't know nothing about it and you are the notary that notarized her Affidavit because you called her in and said fill out this so we will be covered when somebody audits us. And if you don't believe it, call Territha and ask her. Ross Batson is the one that signed the Affidavit after they had her type it up. . . . So, ask him for Territha's Affidavit and ask him for Territha's expense report—moving expense report and I bet you see it's the same as mine. But Territha got paid her $1,600 - $1,700 and I didn't.

Def. Ex. 72 at 6. The defendants argue that, contrary to Smith's claim, Batson did not notarize

Reed's affidavit and that Reed received only $1,104.25 for moving expenses, not the "$1,600 - $1,700" that Smith told the panel that she received.  Smith argues that he did not have access to Reed's affidavit at the time of the grievance hearing, so he was not able to provide an exact amount, which is why he gave a rough figure.  Smith contends that the panel had the power to obtain whatever documents they needed to decide the grievance and that he repeatedly urged the panel to pull Reed's expense report to confirm his testimony.

The fourth statement is:

Lt. Batson actually approved the expense report.  And evidenced [sic] when I was in Austin, Texas I called him and asked him about he [sic] and he said, well I've already initialed it and sent it to the Chief. . . .  So, Lt. Batson had already approved it but after it come back down saying no, we ain't going to do that, then he changes his stance . . . .

Def. Ex. 72 at 6.  The defendants argue that Batson did not approve his expense report.  Smith responds that all of his reimbursements were turned in to Batson, who initially reviewed them and sent them forward for approval.  He argues that his statement about his phone conversation with Batson is true.

The fifth statement is:

And if anybody thinks November 8th to November 17th is time enough to move your family 5 hours away from where you live—5 hours away from where you live—and you working every day—not only was I working but I was getting off at 5:00 and 6:00 in the evening.  Tell me what place in the world you can go secure housing at 5:00 or 6:00 in the evening.  Leaving Jonesboro, getting to Van Buren at 7 - at 11:00 at night.

Def. Ex. 72 at 9.  The defendants argue that Smith's time sheets establish that he was not in fact "working every day" from November 8 to November 17, 2011.  They argue that Smith did not work on November 12 or November 13, 2011.  Furthermore, they contend that on the days that Smith worked he was not getting off every day at 5:00 or 6:00 p.m.  *See* Def. Ex. 77.  Smith responds that

he did not claim that he was getting of "every day" at 5:00 or 6:00 p.m.  However, he notes that on November 17 he did go off the clock at 5:48 p.m. and on November 10 he went off the clock at 8:06 p.m.  Furthermore, he notes that he explicitly stated before the panel that November 12 and 13 were his "RDO" or "regular day[s] off."  *See* Def. Ex. 72 at 3.  Moreover, Smith argues that the transcript shows that he provided a copy of his time records to each grievance panel member and that he specifically drew their attention to those records, explaining them in great detail.  Finally, he argues that seven to eleven o'clock p.m. was a reasonable estimate of what his arrival time in Van Buren would have been if he had driven there after going off the clock.

Smith's most compelling argument that the decision to discharge him was an act of racial discrimination is based on a comparison of his discipline with that of Caucasian officers who committed acts of dishonesty.  A comparator must be "similarly situated in all relevant respects," and "the relevant respects are the conduct of the employees and any disparity in their discipline."  *Chappell v. Bilco Co.*, 675 F.3d 1110, 1119 (8th Cir. 2012).  Smith must show that he "was treated differently than other employees whose violations were of comparable seriousness."  *Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1085 (8th Cir. 2013) (emphasis omitted).

Although Smith cites a multitude of allegedly comparable instances of misconduct by Caucasian employees who were disciplined less severely than he was, three of these instances have the most probative value.  First, an investigation in 2002 determined that Officer A, a Caucasian, engaged in consensual sexual relations with another officer during duty hours and later denied doing so before subsequently recanting his denial.  Def. Ex. 92.  Burks suspended Officer A without pay for 10 days and demoted him to the rank of Corporal.  *Id.*  Second, the Arkansas Highway Police has a domicile policy that requires officers to live within certain geographical boundaries of their place of employment.  An investigation in 2009 resulted in Burks's disciplinary action against four

14

officers who reported home addresses that complied with the domicile policy but whose actual residences were not in compliance with that policy. Officers B, C, and D (holding the rank of Private First Class) and Officer E (holding the rank of Sergeant), all Caucasians, were suspended for 10 days without pay, ordered to comply with the domicile policy, and demoted. *See* Def. Ex. 93, 94, 95, and 96. Officer B, in particular, was notified that this discipline was "a result of the policies violated and the subterfuge employed in doing so." Def. Ex. 93. Finally, an investigation in 2012 revealed that several officers had claimed reimbursements for breakfast meals during a trip even though the hotel at which they were staying provided a full complimentary breakfast. *See* Def. Ex. 100. The officers had been instructed on how to claim lunch and evening meals, but not breakfast. *See* Def. Ex. 101. Officers H, I, J, and K (all Caucasian) had expense requests that either were revised after Burks inquired into them or else they were subsequently not reimbursed in full. Although the defendants argue that the misconduct of these employees was less serious than Smith's, that is an issue for the jury to decide. *See Jones v. Evergreen Packaging, Inc.*, 536 Fed. Appx. 661, 662 (8th Cir. 2013) (quoting *George v. Leavitt*, 407 F.3d 405, 414 (D.C. Cir. 2005) ("similarly situated" issue is ordinarily a question of fact for the jury)). A jury could find that these examples represent misconduct comparable to Smith's for which the Caucasian comparators received less severe disciplinary treatment or none at all. The defendants argue that "an employer who investigates allegations of workplace misconduct is entitled to latitude in evaluating the information gathered, so long as the employer acts in good faith." *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 417 (8th Cir. 2010). Nevertheless, a jury could reasonably infer from the evidence that the Arkansas Highway Police acted with discriminatory intent when it terminated Smith. Consequently, Smith's Title VII discrimination claim survives summary judgment.

15

### 2.       *Title VII Retaliation Claim*

The burden shifting framework discussed above applies also to Title VII retaliation claims. To establish a prima facie case of retaliation, Smith must show that 1) he engaged in statutorily protected conduct; 2) he suffered an adverse employment action; and 3) that a causal connection exists between the two.  *See Fiero v. CSG Sys., Inc.*, 2014 WL 3511780, at *5, __ F.3d __, __ (8th Cir. July 17, 2014).

It is undisputed that Smith engaged in statutorily protected conduct and suffered adverse employment actions in the form of termination and a negative employment reference.  To establish causation, Smith must show that the desire to retaliate was the but-for cause of the Arkansas Highway Police's actions against him—that is, "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action." *Wright v. St. Vincent Health Sys.*, 730 F.3d 732, 737 (8th Cir. 2013).  The defendants argue that Smith received many promotions and merit raises over the course of his employment and that Burks concurred in them.  Furthermore, the defendants argue that the protected activities in which Smith participated, including Ricky Smith's lawsuit and Smith's June 2011 complaint, were remote in time and were resolved in March and April 2012—two to three months before Smith's termination.  *See* Def. Ex. 119; *Smith*, No. 4:10-CV-01557-SWW, 2012 WL 846441, at *9.  They argue that Smith's complaints and other protected activities did not result in any adverse findings against Burks.

Smith has submitted evidence from which a jury reasonably could infer that he was discharged in retaliation for engaging in protected activity.  Smith filed grievances alleging claims of discrimination and retaliation in January 2011 and June 2011.  Smith also filed an EEOC complaint in June 2011.  Smith gave deposition testimony favorable to Ricky Smith in November 2011.  Smith filed a grievance over the denial of his reimbursement in February 2012, and then

16

pursued that grievance to a hearing, which was held on May 14, 2012. Burks began the investigation that culminated in Smith's termination in the weeks following that hearing, as evidenced by Hickman's statements and the timing of his June 19, 2012 letter to Smith. This short time frame, together with the comparators discussed above, is evidence from which a jury reasonably could infer that Smith was discharged in retaliation for conduct that is protected by Title VII. The evidence of Smith's prior promotions and merit raises falls short of establishing that there is no genuine dispute of material fact for a jury to decide.

The defendants further argue that there is no causal connection as regards the negative employment reference to the Arkansas Department of Corrections because there is no temporal proximity. Smith's employment was terminated on July 9, 2012. The Arkansas Highway Police gave the Arkansas Department of Corrections a negative reference seven months later, in February 2013. Although temporal proximity can provide some evidence of causation, it is not generally sufficient to prove the element of causation. *Wedow v. City of Kansas City, Mo.*, 442 F.3d 661, 675 (8th Cir. 2006). Neither is evidence of temporal proximity necessary in cases such as this, where the Arkansas Highway Police had already terminated Smith, and it did not have the occasion to provide an employment reference until seven months later. *Dixon v. Gonzales*, 481 F.3d 324, 335 (6th Cir. 2007) ("[A] mere lapse in time between the protected activity and the adverse employment action does not inevitably foreclose a finding of causality."); *see id.* (discussing cases). That a jury could reasonably infer that the Arkansas Highway Police would not have terminated Smith but for retaliatory conduct renders it reasonable that it would not have given him a negative employment reference but for that same retaliatory motive. Consequently, Smith has established his prima facie case of Title VII retaliation.

The Arkansas Highway Police argues that Smith cannot show pretext because he cannot

prove that its reasons for terminating him or giving him a negative employment reference were false. However, the discussion of the Arkansas Highway Police's proffered reasons for terminating Smith and the analysis of pretext in the context of Smith's discrimination claim, supra, is sufficient to show that Smith has provided evidence from which a jury could reasonably infer that the Arkansas Highway Police's explanation is a pretext for unlawful retaliation. Consequently, Smith's Title VII retaliation claim survives summary judgment.

**B.      Section 1981 Claims against the Individual Defendants and Qualified Immunity**

Smith brings his section 1981 claims by way of 42 U.S.C. § 1983. "The limitations period for a section 1983 action is governed by the statute of limitations for personal injury actions in the state in which the claim accrues." *Sanchez v. United States*, 49 F.3d 1329, 1330 (8th Cir. 1995) (citing *Wilson v. Garcia*, 471 U.S. 261, 280, 105 S. Ct. 1938, 1949, 85 L. Ed. 2d 254 (1985)). Smith's claim accrued in Arkansas, and "[i]n Arkansas, the statute of limitations for personal-injury claims is three years." *Early v. Baker*, 2013 Ark. 511 (2013) (citing Ark. Code Ann. § 16-56-105(3) (Repl. 2005)). Smith filed his complaint on May 20, 2013, so the section 1981 claims he brings against the individual defendants by way of section 1983 may be based only on the defendants' actions since May 20, 2010.

The defendants argue that Burks, Holmes, Claunch, and Moore are entitled to the defense of qualified immunity on the claims against them in their individual capacities. "Qualified immunity shields government officials from liability when 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *McCaster v. Clausen*, 684 F.3d 740, 746 (8th Cir. 2012) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). The defendants are entitled to qualified immunity unless (1) the facts alleged or shown, construed most favorably to Smith, establish a violation of a

constitutional or statutory right, and (2) at the time of the defendants' alleged misconduct that constitutional or statutory right was clearly established such that a reasonable official would have known that the acts were unlawful. *See Edwards v. Byrd*, 750 F.3d 728, 731-32 (8th Cir. 2014).

"Section 1981 protects a person from discrimination on the basis of race in the making and enforcing of contracts. Although not specifically referenced in the statute, § 1981 applies to employment contracts." *Askari v. L.A. Fitness Int'l, LLC*, CIV. 09-2789 ADM JSM, 2010 WL 3938320, at *2 (D. Minn. Oct. 5, 2010) (internal citation omitted). At all times relevant to Smith's section 1981 claims, it was clearly established that "an at-will employee could not be fired on the basis of his race or in retaliation for exercising his rights, either constitutional or statutory." *Turner v. Ark. Ins. Dep't*, 297 F.3d 751, 759 (8th Cir. 2002).

Smith has alleged that Holmes and Moore were involved in various acts of race-based discrimination against him. Viewing the evidence in the light most favorable to Smith, he has shown evidence that during the statutory period Holmes gave him a poor evaluation prior to his being promoted, conducted a several-month-long investigation into the citizen complaint against him, improperly failed to notify him of a public meeting, and participated in overturning his discipline of a subordinate. Likewise, Smith has shown evidence that Moore failed to recommend him for a merit raise. However, Smith's evidence that Holmes's or Moore's actions during the statutory period were motivated by unlawful animus is not sufficient to establish a section 1981 claim against those defendants.

Burks, however, instigated Smith's termination, and the recommendations by Claunch and Burks ultimately led to that termination.[5] In light of the conclusion, explained above, that genuine

---

[5] As the Court noted in a previous opinion, Bennett was the ultimate decisionmaker. Smith does not allege that Bennett was motivated by racial bias, but he does allege that Bennett relied on

disputes of fact exist as to whether the decision to terminate Smith was an act of racial discrimination, Claunch and Burks are not entitled to summary judgment on Smith's section 1981 claims against them.

For these reasons, Holmes and Moore are entitled to summary judgment on the grounds of qualified immunity, but Claunch and Burks are not.  Consequently, the individual and official-capacity section 1981 claims against Claunch and Burks will proceed to trial.

## C.      Smith's Claim for Judicial Oversight

The defendants have moved for summary judgment on Smith's request for injunctive relief in the form of continuing oversight by this Court to assure the absence of alleged systemic racial discrimination in the Arkansas Highway Police's employment decisions.   The enforcement provisions of Title VII provides, in pertinent part:

> If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate.

42 U.S.C. § 2000e-5(g)(1).   This provision specifically grants federal courts "broad equitable powers" to fashion relief that makes persons whole for injuries they have suffered as a result of unlawful employment discrimination.  *Locke v. Kansas City Power & Light Co.*, 660 F.2d 359, 367 (8th Cir. 1981).  A court's grant of equitable relief must be accompanied by findings sufficient to support that relief.  *Id.*

---

the recommendation of Burks and Claunch, whom he claims were motivated by racial bias.  *See* Document #20 at 12-14.

Smith has provided as exhibits the Arkansas Highway & Transportation Department's EEO and affirmative action reports for the years from 2008 to 2012.  Pl. Ex. 9, 10, 11, 12, 13, & 14. These exhibits provide numerous pages of detailed employment statistics for the Arkansas Highway & Transportation Department.  However, Smith's brief in response to the defendants' motion for summary judgment contains slightly over one page of argument in support of his request for judicial oversight.  Pl. Br. in Resp. at 30-31.  There, Smith argues that from the years 2008 to 2012 the Arkansas Highway & Transportation Department's workforce has been roughly 80% Caucasian and 16% African-American.  *See id.* at 31.  Smith's statistics show that during each of the years 2008 and 2012—the only years for which Smith provides comparable numbers for Caucasians and African-Americans[6]—the Arkansas Highway & Transportation Department forced the terminations of 27 Caucasians and 26 African-Americans.  *See id.*  Smith argues that terminations have been disproportionately borne by African-Americans and that this fact gives rise to an inference of ongoing, systemic discrimination.

Smith's statistics concern the Arkansas Highway & Transportation Department as a whole, and not merely the Arkansas Highway Police.  Furthermore, termination reports for two years are not, by themselves, sufficient to warrant continuing oversight over the Arkansas Highway Police or the Arkansas Highway & Transportation Department.

> [E]mployment discrimination litigation such as this ought not be a mechanism for indefinite judicial supervision of an employer's hiring and promotion practices. Employees still have the statutory protection afforded them by Title VII and other applicable law and can seek judicial relief again in the future if necessary.  The existence of adequate remedies of this type discourages employers from further discrimination, just as ongoing litigation does.

---

[6] Smith's statistics for the years 2009, 2010, and 2011 report figures for "white versus minority" terminations instead of figures for "white versus black" terminations.  *See* Pl. Br. in Resp. at 31.

*Jones v. Memphis Light, Gas & Water Div.*, 642 F. Supp. 644, 651 (W.D. Tenn. 1986); *E.E.O.C. v. Delight Wholesale Co.*, 765 F. Supp. 583, 592 (W.D. Mo. 1991) (holding that an order requiring compliance with the law and requiring court supervision is unnecessary, wasteful of the court's resources, and duplicates the law with which the defendant must already comply). Federal courts "do not sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Bone v. G4S Youth Servs.*, LLC, 686 F.3d 948, 955 (8th Cir. 2012) (quotation and citation omitted). For these reasons, Smith's request for continuing judicial oversight cannot survive summary judgment.

**D.     Defendants' Motion to Strike Affidavits and After-Acquired Evidence Defense**

The defendants have raised after-acquired evidence as an affirmative defense to Smith's claims. This defense is based on a complaint by Casenthia Miller that Smith touched her inappropriately after Smith had arrested her in June 2004. *See* Def. Ex. 135. The Arkansas Highway Police conducted an investigation at that time. *See id.* Arkansas Highway & Transportation Department Chief Legal Counsel Robert Wilson informed Burks that Miller had recanted her statement. Def. Ex. 55 at 1 ¶ 7. As a result, Burks ended the investigation of Smith's conduct and refrained from further disciplining him. *Id.*

However, the defendants have submitted an affidavit by Miller (now Campbell) along with their motion for summary judgment. Def. Ex. 135. In that affidavit, Miller states that she never recanted her statement that Smith touched her inappropriately. *Id.* at 2 ¶ 14. The defendants argue that this affidavit is after-acquired evidence of Smith's wrongdoing that precludes an award of damages or injunctive relief. In response, Smith has submitted the affidavits of Wilson and attorney John Walker, who represented Smith in his prior lawsuit, stating that Miller recanted her statement

22

at the time of the 2004 investigation.  Pl. Ex. 16 & 17.  The defendants have moved to strike Wilson's and Walker's affidavits on the grounds that they contain inadmissible hearsay.

Contrary to the defendants' argument, Miller's affidavit does not provide after-acquired evidence of Smith's wrongdoing.  After-acquired evidence is the "later discover[y] [of] some wrongful conduct that would have led to discharge if it had been discovered earlier."  *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 356, 115 S. Ct. 879, 883, 130 L. Ed. 2d 852 (1995); *see E.E.O.C. v. Dial Corp.*, 469 F.3d 735, 744 (8th Cir. 2006) (describing *McKennon*'s holding as applying to "an employer's belated discovery of wrongdoing by a dismissed employee.").  Here, the Arkansas Highway Police and the Arkansas Highway & Transportation Department knew of and investigated Miller's allegations against Smith in 2004.  Miller's current affidavit provides no new allegations against him.  Wilson and Walker's affidavits provide admissible evidence that Miller's allegations were investigated at that time and so cannot pass for after-acquired evidence.  For these reasons, the defendants' after-acquired evidence defense fails and the defendants' motion to strike the affidavits of Black and attorneys Wilson and Walker will be denied.

E.     **Motion to Strike Captain Joe Black's Affidavit**

The defendants argue that portions of Black's affidavit should be struck because they are "complete fabrication[s]," "based on speculation and conjecture as to his interpretation of an alleged remark, which never actually occurred," and  countered by other evidence.  Document #68 at 2-3; *see id.* at 3-7.  Smith responds that Black's affidavit unequivocally affirms that he was present at the events described in his affidavit and that he has personal knowledge of them.  *See, e.g.*, Pl. Ex. 2 at 3 ¶ 9 ("He made these comments in my presence.  I am not merely repeating what someone else told me he said."); *id.* ¶ 10 ("I have personal knowledge of an incident . . . .").  Because Black's affidavit is based on personal knowledge and contains admissible evidence, the defendants have not met their

burden of showing grounds for striking it.

## III.

Smith has filed a motion in limine and the defendants have filed three motions in limine that would exclude a large amount of evidence and testimony from being considered at the summary judgment stage or presented at trial.

The consequences of excluding evidence before trial must be considered with particular care. *See Estes v. Dick Smith Ford, Inc.,* 856 F.2d 1097, 1103 (8th Cir.1988), *superseded on other grounds by Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989), *as stated in Foster v. University of Ark.,* 938 F.2d 111, 115 (8th Cir. 1991). Furthermore:

> The effects of blanket evidentiary exclusions can be especially damaging in employment discrimination cases, in which plaintiffs must face the difficult task of persuading the fact-finder to disbelieve an employer's account of its own motives . . . . Circumstantial proof of discrimination typically includes unflattering testimony about the employer's history and work practices—evidence which in other kinds of cases may well unfairly prejudice the jury against the defendant. In discrimination cases, however, such background evidence may be critical for the jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive.

*Hawkins v. Hennepin Technical Ctr.*, 900 F.2d 153, 155 (8th Cir. 1990) (quoting *Estes*, 856 F.2d at 1103) (alteration in *Hawkins*).

Smith's two charges of discrimination with the Equal Employment Opportunity Commission were submitted on June 21, 2012, and February 12, 2013, respectively. "In order to pursue a Title VII action, plaintiffs generally must file an administrative charge with the EEOC within 180 days after the alleged unlawful employment practice occurred." *Bissada v. Arkansas Children's Hosp.*, 639 F.3d 825, 830 (8th Cir. 2011) (citing 42 U.S.C. § 2000e–5(e)(1)). December 24, 2011 is 180 days prior to Smith's first charge of discrimination, so his Title VII claims for race discrimination and retaliation may be based only on actions of the defendants since that date. Smith responds that

"[t]he incidents preceding the 180-day period are 'relevant background evidence'" of discrimination. Def. Br. In Supp. of Resp. at 22.

An employer's conduct throughout a plaintiff's employment may be relevant to a claim of discrimination that is premised on the employer's conduct at a later time. *See United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S. Ct. 1885, 1889, 52 L. Ed. 2d 571 (1977) ("A discriminatory act which is not made the basis for a timely charge . . . may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue . . . ."); *Denesha v. Farmers Ins. Exch.*, 161 F.3d 491, 500 (8th Cir. 1998) ("[A] jury in assessing whether an employer's proffered reasons for the adverse employment action constitute pretext and whether there was intentional discrimination may consider the employer's conduct throughout the employee's tenure with the company."); *White v. Honeywell, Inc.*, 141 F.3d 1270, 1276 (8th Cir. 1998) (holding that relevant and highly probative background evidence that falls outside the limitations period is admissible to prove a Title VII claim of discrimination); *Clements v. Gen. Acc. Ins. Co. of Am.*, 821 F.2d 489, 492 (8th Cir. 1987) (holding that evidence of statements made several years prior to the plaintiff's termination in reference to positions other than the one held by plaintiff was "nonetheless probative of a general intent or inclination to discriminate" and sufficient to create a jury question on whether the proffered reason for termination was a pretext for unlawful discrimination).

Nevertheless, not all relevant evidence is admissible at trial.

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Fed. R. Evid. 403. If evidence of all of the vast number of incidents that the parties wish to introduce were allowed, the jury would be so inundated with evidence and counter evidence

regarding so many occasions of alleged misconduct by Smith, the defendants, and others that they undoubtedly would be confused and likely would be misled as to the questions that they actually must decide, which relate solely to the reasons for Smith's termination.  Absent some limit, the jury will be overwhelmed with a multitude of miniature trials regarding incidents many of which were remote in time from the decision by the Arkansas Highway Police to discharge Smith and many of which concern persons other than Smith and the individual defendants remaining in this case.  In an effort to confine the evidence to be presented to relevant evidence the probative value of which is not substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, and wasting time, the Court states as follows:

1.      Evidence regarding the comparators discussed above will be admitted.

2.      Evidence regarding divisions of the Arkansas Highway & Transportation Department other than the Highway Police will not be admitted.[7]

3.      Evidence regarding comparators whose misconduct was something other than dishonesty likely will not be admitted.  If such evidence is offered, the Court will scrutinize it closely to determine whether its probative value is substantially outweighed by Rule 403 considerations.

4.      Evidence regarding alleged misconduct by Smith that was brought to the attention of the Arkansas Highway Police during his tenure as an employee with respect to which the Arkansas Highway Police determined no discipline would be administered will not be admitted for the purpose of showing that Smith did not meet the

---

[7] Smith argues that evidence regarding other divisions is admissible because the person who made the ultimate decision to discharge him was Bennett, who was the Director of the Arkansas State Highway & Transportation Department.  However, as noted above, Smith does not allege that Bennett was motivated by racial bias.  *Supra* at 20 n.5.

legitimate expectations of the employer.  If such evidence is offered for some other purpose, the Court will scrutinize it closely to determine whether its probative value is substantially outweighed by Rule 403 considerations.

5.      Stray remarks that are remote in time and were made by persons other than the named defendants remaining in this case will not be admitted into evidence.

6.      Opinion testimony that a given individual is a racist will not be admitted.

In light of the fact that the trial has been continued until April 20, 2015, to the extent that the motions in limine seek to exclude other evidence as to which the Court has not ruled, the motions will be denied as premature.  The Court orders the lawyers to meet and confer in good faith in an effort to narrow the issues that will be presented in motions in limine to evidence that actually will be offered and as to which there is a good faith dispute as to admissibility.  In view of the large number of issues presented in the pending motions in limine, the scheduling order will be amended as follows.  First, the lawyers must meet *on or before March 6, 2015*, to discuss the evidence that will be presented by each side and to confer in good faith in an effort to narrow the evidentiary issues.  Second, motions in limine must be filed *on or before March 13, 2015*.  Third, replies must be filed *on or before March 20, 2015*.  Fourth, a hearing on the motions in limine will be conducted *beginning at 9:00 a.m. on March 27, 2015*, in the Richard Sheppard Arnold United States Courthouse, Courtroom #4D.

## CONCLUSION

The defendants' motion for summary judgment is granted in part and denied in part. Document #42.  Darren Smith's section 1981 claims against Captain Jeff Holmes and Lieutenant James Moore are dismissed.  Smith's claim for continuing judicial oversight over the Arkansas Highway Police or the Arkansas Highway & Transportation Department is dismissed.  Smith's

Title VII discrimination and retaliation claims against the Arkansas Highway Police and his section 1981 claim against Chief Ron Burks and Major Paul Claunch in their individual and official capacities survive summary judgment and will proceed to trial. The defendants' motion to strike is denied. Document #67. As stated above, the pending motions in limine are granted in part and denied in part. Documents #47, #49, #53 & #55.

IT IS SO ORDERED this 22nd day of August, 2014.

_____

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE